IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| MESEARCH MEDIA TECHNOLOGIES LIMITED, *Debtor.* | : : : : : | Case No. 24-21982-JCM Chapter 11 (Involuntary) Related to Doc. Nos. 262, 249, 267 |

# MEMORANDUM OPINION

Before the Court is the ***Second Amended Chapter 11 Plan of Reorganization of MeSearch Media Technologies Limited filed by Creditor Game Creek Holdings, LLC dated March 26, 2025*** ("Second Amended Plan") (Doc. 262)[1] with two objections to confirmation, a declaration in support of confirmation, a confirmation hearing record, and an evidentiary hearing record. Weighing the facts before it and the reasoning set forth below, the Court finds the *Second Amended Plan* meets the standards set forth in 11 U.S.C. § 1129 and is confirmable.

The plan proponent, Game Creek Holdings, LLC ("Game Creek") has moved for the confirmation of the *Second Amended Plan*. To establish that the requirements of § 1129 have been met, Game Creek filed the ***Declaration of Joseph Lawrence in Support of the Second Amended Chapter 11 Plan of Reorganization of MeSearch Media Technologies Limited filed by Creditor Game Creek Holdings, LLC dated March 26, 2025*** (Doc. 265) ("Declaration"). The

---

[1] Game Creek solicited for confirmation the ***First Amended Chapter 11 Plan of Reorganization of MeSearch Media Technologies Limited filed by Creditor Game Creek Holdings, LLC dated January 17, 2025*** ("First Amended Plan"), and the day before the March 27, 2025 confirmation hearing filed the *Second Amended Plan* which is virtually identical to the *First Amended Plan* except that it now pays all creditors in full, with interest, leaving Class 4 Equity Holders as the remaining impaired class. Because of this, the Court allowed the confirmation hearing to proceed on the *Second Amended Plan*.

1

two objections to the *Second Amended Plan* include the ***Amended Objection of Crivella Holdings Limited and Arthur Crivella to the Confirmation of the First Amended Chapter 11 Plan of Reorganization of MeSearch Media Technologies Filed by Game Creek Holdings, LLC and Cross-Motion to Designate the Votes of Trib Total Media, LLC, RMS Funding, LLC and Game Creek Holdings, LLC*** ("Crivella Objection") filed by Crivella Holdings Limited and Arthur Crivella ("Crivella") (Doc. 267) and the ***Objection and Reservation of Rights of the United States Trustee to First Amended Chapter 11 Plan of Reorganization of MeSearch Media Technologies Limited filed by Creditor Game Creek Holdings, LLC Dated January 17, 2025*** filed by the Office of the United States Trustee ("U.S. Trustee Objection") (Doc. 249).  The initial confirmation hearing was held on March 27, 2025 ("Confirmation Hearing"), and an evidentiary hearing on whether the *Second Amended Plan* was filed in good faith, as requested by Crivella at the March 27th hearing, was held on April 23, 2025 ("Evidentiary Hearing").  The Court will summarize each of the objections as well as the evidence presented at both the Confirmation Hearing and Evidentiary Hearing, below.

**I.     BACKGROUND**

The Court found the testimony related to the operation of the Debtor helpful to clarify the relationships between the related parties when considering the allegations raised by Crivella.  Mr. Lawrence's testimony explained the purpose of the MeSearch software and how Trib Total Media ("Trib"), the Debtor's only client, was utilizing the software pre- and post-petition.  Based upon Mr. Lawrence's testimony, the Court's rudimentary understanding of the MeSearch/Trib relationship is as follows:  Trib is an online news platform that maintains a website which publishes news articles.  MeSearch software analyzes content from publishers and creates automated tags depending on the subject of the content.  *Audio Hearing Transcript 4/23/25* at

2

10:41:18 – 10:41:49. The software can track users who are logged in to the Trib website, and based upon the individual user data and visitor's preferences, the MeSearch software can present targeted news articles to that visitor. *Id.* at 10:46:40 – 10:47:50 So, rather than users having to search for articles that are of interest to them, the MeSearch system would automatically "tag," identify, and present the articles MeSearch believes, based upon its data and algorithms, are of interest to each particular visitor. *Id.* The benefit of the MeSearch system is that it eliminates the time-consuming task of the "old" method article authors used of manually "tagging" the articles, so when a user searched for a particular topic, the tagged articles would appear. At the present time, Trib is the only "customer" of the Debtor, but the Debtor's goal was to fully develop the software,[2] so it could be commercialized and marketed it to other news outlets. *Id.* at 10:41:49 – 10:42:26.

## II.    CONFIRMATION HEARING

### *U.S. Trustee Objection*

The Court will first address the *U.S. Trustee Objection* which takes the position that the *Second Amended Plan* is speculative because of the pending appeal of the Order entered on February 28, 2025 denying Crivella's Motion for Relief from Stay (Doc. 224). The U.S. Trustee argued since the *Second Amended Plan* relies on the assumption and assignment of the *Software License Agreement* to the Reorganized Debtor that was the subject of the *Motion of Crivella Holdings, Limited for Relief from the Automatic Stay or, in the alternative, for Adequate Protection Pursuant to Section 362(d) of the United States Bankruptcy Code* (Doc. 124), the *Second Amended*

---

[2] Another component to the software which has not been utilized by the Debtor is the "knowledge kiosk" which is comprised of technology subject to the Software License Agreement with Crivella Holdings Limited. Mr. Lawrence testified that it was the Debtor's hope to integrate the knowledge kiosk with the tagging software to broaden the scope of identifiable users and create more personalized content with the ability to scale to the millions of users visiting the website. *Audio Hearing Transcript 4/23/25* at 10:48:00 – 10:49:35.

*Plan* should not be confirmed while the appeal to the District Court is pending. The U.S. Trustee further argued that this pending appeal means the plan is not feasible since it is dependent on the outcome of future litigation.

Game Creek countered these arguments at the Confirmation Hearing by asserting that there is currently $6.5 million available for plan funding on the effective date of the *Second Amended Plan,* and it intends to consummate the *Second Amended Plan* on the effective date regardless of the pending appeal.[3] Game Creek further maintained that upon confirmation of the *Second Amended Plan*, the appeal would become moot since confirmation nullifies the automatic stay, and the terms of the confirmed *Second Amended Plan* control.[4] The Court will not opine on whether this Order has any effect on the implications of the pending appeal and will leave that to the parties to litigate, if necessary. However, the Court does agree with Game Creek that the *Second Amended Plan* is not speculative since Game Creek is willing to proceed with payments to creditors on the effective date despite the pending appeal. Therefore, based upon the foregoing, the Objection to Confirmation of the *Second Amended Plan* filed by the Office of the United States Trustee is overruled.

---

[3] Attached to the *Declaration* is the *Resolution of Trustees of the Richard M. Scaife 2004 Grantor Trust* ("Trustee Resolution") (Doc. 265-2) approving "$6.5 million, plus any additional amounts that may be requested in the future and approved by the Trustees in their sole discretion, in funding to RMS Funding Company, LLC to be used to support its subsidiaries, Game Creek Holdings, LLC's plan of reorganization for the reorganized Debtor."

[4] The Court is not currently weighing in on this argument as it has not been raised as an issue which should prevent confirmation of the *Second Amended Plan*.

### *Crivella Objection*

In the *Crivella Objection,* Crivella objects to confirmation of the *Second Amended Plan* based on its allegations that (i) the *Second Amended Plan* has not been proposed in good faith under 11 U.S.C. § 1129(a)(3), (ii) the *Second Amended Plan* is not in the best interest of equity holders since, in Crivella's opinion, the *Second Amended Plan* does not meet the Chapter 7 liquidation test, and (iii) the *Second Amended Plan* is not feasible. In addition to these arguments, the *Crivella Objection* also contains a Cross-Motion to Designate Votes of Trib Parties ("Cross-Motion"). This Cross Motion is moot since all the classes, except for Class 4 Equity Interests, in the *Second Amended Plan* are now unimpaired, and therefore the Cross-Motion will be denied.[5]

### *Game Creek's Presentation Regarding Satisfaction of 11 U.S.C. § 1129*

During the Confirmation Hearing, Game Creek submitted the *Declaration* and called Joseph Lawrence, the corporate designee of Game Creek Holdings, LLC, to testify in support of the same. The *Declaration* was then admitted for purposes of Mr. Lawrence's direct testimony in favor of the *Second Amended Plan*, and Mr. Joseph Lawrence was cross-examined by Counsel for the objecting party Crivella. Game Creek stated at the Confirmation Hearing that the Second Amended Plan complies with all elements of 11 U.S.C. § 1129(a) and is capable of confirmation. Game Creek noted that all classes of creditors in the *Second Amended Plan* are unimpaired except for the Class 4 Equity Interests.

Game Creek stressed that the *Second Amended Plan* is feasible since all claims will be paid on the effective date, and the future operations of the Reorganized Debtor are irrelevant

---

[5] The Cross-Motion was also filed in the body of the *Crivella Objection* in violation of Local Rule 9013-1(c) stating "Any affirmative request for relief shall be brought by motion and may not be included in any response to a motion." W.PA.LBR. 9013-1, which also serves as an independent basis for denial.

since funding of the *Second Amended Plan* is not dependent on the future success of the Debtor but is instead being funded immediately on the effective date. *Audio Hearing Transcript 3/27/25* at 2:23:00 – 2:23:28. Even so, Game Creek pointed out that additional funds are available and have been allocated for future operations, if necessary. *Id.* at 2:23:30 – 2:23:37.

To counter the allegations in the *Crivella Objection* that the *Second Amended Plan* was not filed in good faith, Game Creek argued § 1129(a)(3) requires the Court to find that the process of plan development was in good faith rather than the content of the plan. *Id.* at 2:24:04 – 2:24:55. In support of this contention, Game Creek asserted that the *Second Amended Plan* was negotiated with the Chapter 11 Trustee who fully supports the plan. *Id.* at 2:25:10 – 2:25:44. Game Creek noted that the *Second Amended Plan* has been "on the docket for many months," and as a result all interested parties have known about the market testing and proposed sale process. *Id.* at 2:25:47 – 2:26:05.

Game Creek highlighted that the plan, sale and bidding processes were all set forth in the *Motion for Entry of an Order (I) Approving the Disclosure Statement, (II) Approving the Forms of Ballots and Solicitation Materials, (III) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan (IV) Establishing the Voting Record Date, (V) Fixing the Date, Time, and Place for the Plan Confirmation Hearing and the Deadline for Filing Objections, and (VI) Granting Related Relief* (Doc. 150) filed on December 13, 2024 ("Motion for Order Establishing Plan Procedures").[6] Further, Game Creek noted that the *Motion for Order Establishing Plan Procedures* was ultimately consented to by Crivella. *See Consent Order Regarding Motion for Entry of an Order (I) Approving the First Amended Disclosure*

---

[6] Paragraph 19 of the *Motion for Order Establishing Plan Procedures* states that "any party in interest that wishes to compete and participate in the sale and cancellation of existing equity of the Debtor shall appear at the Confirmation Hearing."

*Statement…Filed by Petitioning Creditor Game Creek Holdings, LLC* ("Consent Order on Plan Procedures") (Doc. 178), and therefore the processes for market testing the proposed sale and the implementation of the plan had Crivella's consent. *Id.* at 2:26:20 – 2:26:38.

### *Crivella's Confirmation Hearing Allegations*

Crivella alleged that Mr. Lawrence's involvement as CEO of the Debtor before the Chapter 11 Trustee was appointed, his position as shareholder and officer of Game Creek, his position as an officer and board member of RMS Funding, LLC, as well as his involvement with other creditors and customers of the Debtor, necessitates a "specific inquiry and a much higher burden" when determining if the *Second Amended Plan* was filed in good faith. *Id.* at 2:36:06 – 2:36:50.[7] Crivella noted that for good faith to exist there must be a legitimate purpose to a proposed Chapter 11 plan. *Id.* at 2:37:40 – 2:37:38. Crivella alleged that the *Second Amended Plan* was not filed in good faith since it will, according to Crivella, not pay creditors in full, and the same individuals will be running the Debtor post-confirmation while divesting Crivella's equity interests in the MeSearch Software License Agreement and diverting corporate opportunities outside the Debtor. *Id.* at 2:30 – 2:43:10. Considering these allegations and Crivella's request to present further evidence, an evidentiary hearing on whether the plan was filed in good faith was scheduled for April 23, 2025.

---

[7] Crivella cites to *In re Allegheny Intern., Inc.,* 118 B.R. 282 (Bankr. W.D. PA. 1990) for the assertion that there is a higher burden when dealing with the conduct of insiders. *Allegheny International* involves a plan proponent that strategically purchased claims in order to garner votes in favor of the plan, which the court found was done in bad faith since it "provide[d] a settlement to a class of claimholders in absence of a confirmed plan." *Id.* at 296. This Court does not find that this situation is analogous to *Allegheny International* as there has been no evidence presented that Game Creek, nor Mr. Lawrence, manipulated creditors by offering pre-payments to garner support for the *Second Amended Plan*. To the contrary, the *Second Amended Plan* promises payment in full with interest to allowed claims on the effective date.

7

### III.       EVIDENTIARY HEARING

At the Evidentiary Hearing on whether the *Second Amended Plan* meets the good faith standard of § 1129(a)(3), Game Creek proposed that based on the *Declaration* provided by Mr. Lawrence, Game Creek had met its *prima facie* burden of good faith under § 1129(a)(3). The Court agreed with Game Creek's assessment that *prima facie* good faith had been established, and therefore, Game Creek was permitted to forgo additional direct testimony of its declarant, Joseph Lawrence. Game Creek requested a proffer as to the issues that would be raised in the hearing by Crivella. Counsel for Crivella stated that it was her intent to prove that Game Creek was not proceeding in good faith because (i) Joseph Lawrence transferred Debtor-owned assets outside of the Debtor, (ii) Joseph Lawrence diverted corporate opportunities of the Debtor,[8] and (iii) Game Creek misled the Court in its *Second Amended Plan* as to its intentions of the Reorganized Debtor post-bankruptcy. To support these allegations, Crivella called three witnesses.[9]

#### *Transferring Assets Outside of the Debtor*

To support the proffer that Mr. Lawrence transferred Debtor owned assets outside of the Debtor, Crivella presented Wayne Ackman, a software developer employed by Crivella Technologies Limited (the original developer of the MeSearch software) as a witness. Crivella claims that Trib has reverse engineered the MeSearch Software and is using the software and the MeSearch data outside of the terms of the License and Sub-License agreements. Counsel for

---

[8] While the Court does not agree that either of these proffers by Crivella are relevant to the 11 U.S.C. § 1129(a)(3) inquiry as to whether Game Creek proposed the *Second Amended Plan* in good faith since they speak toward the conduct of a former officer of the Debtor (who the Court notes is no longer in control of the operations of the Debtor since a Chapter 11 Trustee was appointed by Order issued on October 2, 2024 (Doc. 64)) the Court allowed Crivella to present evidence on these two points in the event relevant facts arose.

[9] Crivella cross-examined Joseph Lawrence and presented the direct testimony of Wayne Ackman and Arthur Crivella.

Crivella questioned Wayne Ackman regarding the MeSearch software and automated "tagging" system, and whether Mr. Ackman could tell based on looking at the Trib website and MeSearch servers whether MeSearch automated "tags" were still being deployed. Mr. Ackman testified that from viewing the MeSearch server, when he visited the Ascent Data Center with the Chapter 11 Trustee, he could tell that Trib was no longer using the MeSearch software. *Audio Hearing Transcript 4/23/25* 11:26:06 – 11:28:06. When questioned by Counsel for Crivella as to whether certain MeSearch "widgets" were still in use, he said the "activity on our servers are not being called for anything so I would imagine not." *Id.* at 11:36:13 – 11:36:47. Counsel for Crivella showed Mr. Ackman a live view of the Trib website, Mr. Ackman stated in order to be definitive he would also need access to the MeSearch database, and by just looking at the website he would not be able to tell if it was relying upon MeSearch created data. *Id.* at 12:01:35 – 12:02:53. Mr. Ackman further clarified that since the activity logs went from "30,000 down to 10" he can tell that the MeSearch software is not presently being used. *Id.* at 12:04:45 – 12:04:59.

Crivella's argument that the MeSearch software has been reverse engineered rests on the implication that a reduction in usage of the MeSearch data equates to a theft of the intellectual property by Trib. Crivella apparently asks the question: if Trib didn't steal the software, then how does its website continue to tag articles? The explanation was provided by Mr. Lawrence who testified that that Trib ceased using any software related to MeSearch after the filing of the involuntary petition and that Trib reverted back to the old system of manually tagging its articles.[10] *Id.* at 10:05:10 – 10:06:24 and 10:07:23 – 10:08:55. Mr. Ackman, Crivella's witness,

---

[10] Mr. Lawrence further stated that the reason the Trib stopped using the MeSearch tools was "as a result of all of the claims that were made in this case and Art shutting down the servers and making essentially false claims about the sublicenses agreements…." "It was important for the Trib to disconnect from MeSearch so there couldn't be any more claims against the Trib." *Id.* at 10:07:40 – 10:08:05.

9

confirmed that it was possible that is how the Trib website is currently functioning, and he could not provide any evidence to the contrary. *Id.* at 11:46:45 – 11:47:38. No witness provided any testimony that Trib had reverse engineered the MeSearch software or was utilizing the MeSearch software in contravention of the license or sub-license agreements.

Counsel for Game Creek also pointed out that the sublicense between MeSearch and Trib to use the patented technology has been filed of record in this case, and even if Trib was still using the patented technology, Trib is entitled to do so under the sub-license. *Id.* at 11:55:31 – 11:55:50. *See Exhibit B, "*MeSearch Media Sublicense for Use*"* (Doc. 124-2).

The Court finds that Mr. Ackman's testimony does not support the conclusion that assets were transferred outside of the Debtor, but rather supports Game Creek's assertion that the use of the MeSearch application and data has been paused. No other evidence was presented to support the allegation of asset transfer and therefore, the Court finds that Crivella has failed to provide any evidence that any Debtor assets have been transferred.

### *Diversion of Corporate Opportunities*

Crivella alleges that Mr. Lawrence diverted the corporate opportunities of MeSearch post-petition by engaging in discussions with OWNLocal for future business opportunities. Crivella questioned Mr. Lawrence regarding Crivella's Exhibit 1 (Doc. 336), an email from Mr. Lawrence to the Chapter 11 Trustee regarding developing future opportunities with OWNLocal. *Audio Hearing Transcript 4/23/25* at 10:23:18 – 10:28:24. Mr. Lawrence credibly testified that he was seeking permission from the Chapter 11 Trustee to continue to develop the relationship with OWNLocal because "OWNLocal had thousands of publisher customers that it was willing to integrate with the Debtor's products." *Id.* at 10:23:44 – 10:24:25. Mr. Lawrence

10

sought to commercialize the relationship between the Debtor and OWNLocal since OWNLocal had an existing customer base. *Id.* at 10:24:25 – 10:24:57.

The Court views this testimony as showing Mr. Lawrence attempted to use his contact with OWNLocal to create future opportunities for the Debtor, not as a means of diverting the Debtor's opportunities to OWNLocal as Counsel for Crivella implied. During Crivella's closing argument, Counsel argued that the "purported CEO of the Debtor has been undermining the Debtor" because "the Trib wanted to get a deal done with OWNLocal." *Id.* at 1:02:50 – 1:03:20. The Court finds that this is a conclusory argument that was not connected to any testimony elicited from Mr. Lawrence and/or any other witnesses at the Evidentiary Hearing. Once again, no evidence was presented that would support the position that any party diverted corporate opportunities of the Debtor to another entity.

### *Misleading the Court*

Crivella also argues that Mr. Lawrence intentionally mislead the Court as to Game Creek's intentions as the Reorganized Debtor by failing to disclose his communications and intentions to partner with OWNLocal post-bankruptcy, *Id.* at 1:11:20 – 1:11:50. Mr. Lawrence credibly testified that there is no current "deal" with OWNLocal, but in the past the parties had many negotiations and communications. *Id.* at 9:58:03 – 9:58:48. Mr. Lawrence stated that past discussions entailed an ongoing relationship between the Debtor and OWNLocal, whether that be as a partner to OWNLocal where OWNLocal provided customers, or an acquisition of OWNLocal. *Id.* at 9:58:50 – 9:59:31.

The Court is not of the opinion that Mr. Lawrence's communications with OWNLocal or future aspirations to either partner with or acquire OWNLocal have mislead the

11

Court in any way. There is nothing concrete regarding the parties' relationship that Game Creek needed to include in the *Second Amended Plan* or Disclosure Statement. The Court finds that the future operations of the Reorganized Debtor are irrelevant to whether or not the *Second Amended Plan* was filed in good faith, so long as the *Second Amended Plan* does not rely upon those future events to determine feasibility, which it does not in this case.

### *Lack of Fundamental Fairness in Dealing with Creditors*

To support the argument that Game Creek has not exhibited a fundamental fairness in dealing with creditors, Arthur Crivella was placed on the stand and asked only the following three questions by counsel for Crivella, Attorney Kathryn Harrison.

> Harrison: Mr. Crivella, did you ever receive a ballot on Game Creek's plan of reorganization as an equity interest holder?
>
> Crivella: No.
>
> Harrison: Did you ever receive a ballot to vote on the Game Creek plan of reorganization as a general unsecured creditor?
>
> Crivella: No.
>
> Harrison: Did any of your entities ever receive a ballot to vote on the plan of reorganization proposed by Game Creek as any type of creditor or interest holder in this case?
>
> Crivella: No.

*Id.* at 12:07:29 to 12:08:08. Crivella further presented evidence that the ballots intended for Crivella Holdings Limited were sent to Attorney Joseph Sisca and not Crivella or current counsel. Game Creek acknowledged this clerical error but noted that Attorney Joseph Sisca continues to be listed as counsel of record for Arthur Crivella on the docket of this case, despite Attorney Harrison taking over that representation, and therefore, the error was reasonable and not intentional. Game Creek avers that it did attempt to send Arthur Crivella a ballot in his capacity as a Class 4 Equity

12

Interest holder. *See Audio Transcript 4/23/25* and *Movant's Exhibit 4* (Doc. 337). Game Creek also stated that a copy of the ballot was attached to the *Motion for Order Establishing Plan Procedures* at Exhibit B. Importantly, the Court notes that Crivella, through counsel, consented to the *Consent Order on Plan Procedures* which shows Crivella and his counsel were provided with a copy of the *Motion for Order Establishing Plan Procedures* that included the ballot.

The Court agrees with Game Creek, that Atty. Harrison, Crivella's current Counsel, had ample access to the ballot and had full knowledge of the plan, ballot deadline and ballot form. Further, knowing that her client had not received a ballot, she could have contacted Game Creek and requested one if she believed it was important to do so. Based on the foregoing, the Court does not find that Game Creek's conduct in mailing a ballot to Atty. Joseph Sisca, counsel of record for Crivella, instead of Attorney Harrison indicates a lack of fairness in dealing with Crivella throughout the plan solicitation process. Regardless of the alleged technical violation of mailing the ballot to the incorrect attorney, the issue is moot since Crivella Holdings, LLC holds a disputed claim and, according to the *Motion for Order Establishing Plan Procedures* to which Crivella consented, any entity holding a disputed claim is not entitled to vote.[11]

## IV. DICUSSION

### *Good Faith Standard of 11 U.S.C. § 1129(a)(3)*

To establish good faith under § 1129(a)(3), a plan must have "been proposed in good faith and not by any means forbidden by law." Although good faith is undefined in the Bankruptcy Code, the Third Circuit has directed Courts to consider "the plan itself and whether it

---

[11] The specific language regarding claims entitled to vote is contained in Paragraph 14(f) of the *Motion for Order Establishing Plan Procedures*.

will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re W.R. Grace & Co.,* 475 B.R. 34, 87 (D. Del. 2012) citing to *In re Frascella Enter., Inc.*, 360 B.R. 435, 446 (E.D.Pa.2007) (quoting *In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir.2000)). Cases in the Third Circuit have interpreted this section to require the Court to determine whether a plan:

> (1) fosters a result consistent with the [Bankruptcy] Code's objectives;
>
> (2) has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected; and
>
> (3) [exhibited] a fundamental fairness in dealing with the creditors.

*In re W.R. Grace & Co.,* 475 B.R. 34, 87-88 (D. Del. 2012); quoting *Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001).

The plan confirmation process proceeded in accordance with the *Consent Order on Plan Procedures.* Crivella has been a party to the plan process throughout the entirety of this case. The record is devoid of any evidence that support's Crivella's argument that the *Second Amended Plan* was not proposed with honesty, good intentions, and with a basis for expecting reorganization to occur. To the contrary, Crivella's consent to the *Consent Motion on Plan Procedures* indicates that the plan solicitation process was fair, reasonable, honest and agreeable to all parties.

The Court finds that it is disingenuous for Crivella to now argue that that process was unfair and not in good faith when Crivella participated in and consented to it. Further, the Court finds there is nothing objectionable about the process in which this plan was presented to the parties and to the Court. There is sufficient evidence to conclude that the *Second Amended Plan* is not speculative and that the proposed purchaser has sufficient funding in place to meet all

14

proposed payments to creditors on the effective date. The *Declaration* and *Trustee Resolution* filed by Game Creek showing the available plan funding prove that Game Creek has the ability and intention to pay all allowed claims on the effective date. At the Evidentiary Hearing, Mr. Lawrence testified there are "sufficient funds to pay the claims in full" *Audio Hearing Transcript 4/23/25* at 10:33:02 – 10:33:10. When questioned how $6.5 million would be sufficient to pay over $9 million in claims (which include the disputed Crivella claims in excess of $6 million) Mr. Lawrence pointed out that over $3 million in the claims to be paid under the *Second Amended Plan* do not require cash to pay them because they are claims of the related Trib entities, noting that RMS Funding and Game Creek do not have to use cash to pay off their own claims. *Id.* at 10:33:11 – 10:33:53. Counsel for Game Creek reiterated this point in his closing argument, stating that in the event Crivella's contested claims become allowed claims, those would be paid in full and there are sufficient funds available to do so as set forth in the *Trustee Resolution*. *Id.* at 1:21:36 - 1:21:39.

Crivella also questioned the market test of the valuation of the sale as set forth in the Game Creek plan. Counsel repeatedly argued that Game Creek had not done enough to establish that fair market value was being paid. However, no evidence was introduced by Crivella to suggest that the proposed value to be paid under the *Second Amended Plan* is insufficient. Mr. Crivella himself, who was called to the stand, did not even offer a lay opinion as to his opinion of the value of MeSearch and/or whether or not the Game Creek offer was reasonable or not. It has been the longstanding principle of bankruptcy sales that something is only worth what someone is willing to pay for it. The bankruptcy process itself provides all parties and third parties the opportunity to place competing bids to assure that a proposed sale receives the highest possible offer. In this case, the sale was advertised in conformity with the local rules, Crivella was aware of the proposed sale for several months as it was contained in the first version of the Chapter 11

15

Plan filed by Game Creek on January 8, 2025 (Doc. 162), and Crivella had ample opportunity to find alternate bidders or place a competing bid himself at the time of the Confirmation hearing held on March 27, 2025. Crivella did nothing in that regard.

The focus of Crivella during the cross-examination of Joseph Lawrence during the Evidentiary Hearing was on the efforts he had undertaken for future plans with the Reorganized Debtor and urged the Court to conclude that the prospective dealings with OWNLocal were not in good faith. Joseph Lawrence testified that he had discussions with Lloyd Ambrust of OWNLocal and that the purpose of those discussions was an attempt to foster a future relationship between the Reorganized Debtor and OWNLocal. However, the Court does not agree with Crivella's conclusion that Game Creek's tenuous plans of potentially acquiring OWNLocal post-bankruptcy affect the good faith analysis. Furthermore, Mr. Lawrence credibly testified at the Evidentiary Hearing that the purpose of the discussion with OWNLocal was to garner customers for the Debtor, and if anything, shows that the Reorganized Debtor has a plan to continue to operate post-bankruptcy which supports a further finding that the plan is being offered in good faith and is feasible. *Id.* at 10:28:00 – 10:28:10.

The Court finds that the *Second Amended Plan* proposes to pay all allowed claims on the effective date, was advertised as a sale pursuant to the Court's Local Rules, was solicited in accordance with the *Consent Order on Plan Procedures,* fosters a result consistent with the Bankruptcy Code's objectives, and was proposed in good faith and with honest intentions.

### *Best Interest of Creditors*

The Court also agrees with the plan proponent in finding that the *Second Amended Plan* is in the best interest of creditors under § 1129(b)(2)(C). As pointed out by Game Creek at

16

the Confirmation Hearing, in the event of a Chapter 7, the assignability of the Software License Agreement would be tenuous, and there would likely be no assets of the Debtor available for liquidation and/or payment to creditors. This is in contrast to the overwhelmingly positive creditor treatment in the *Second Amended Plan,* which will pay all creditors in full, with interest, and provide a dividend to equity holders. Crivella, as an equity holder, retorts that his interest is not being paid in full but provides no alternate basis for valuation of that interest beyond a pre-petition offer that he previously rejected.

Turning to what is required to be provided to equity holders under 11 U.S.C. § 1129(b)(2)(C), if a class of interests does not vote in favor of the plan, the plan can satisfy the fair and equitable requirement by i) providing to the each interest holder in the impaired class the value of the interest *or* ii) the holder of junior interests will not receive or retain any property. 11 U.S.C. § 1129(b)(2)(C)(i)-(ii).; *In re Global Fertility,* 663 B.R. 584, 609 (Bankr. S.D.N.Y. 2024).[12] The sale was advertised, and since no better offers were received, the $100,000.00 pro rata payment to Class 4 equity interest holders represents the appropriate value and therefore § 1129(b)(2)(C)(i) is met. However, even if (C)(i) is not met, the "or" in this section makes the requirement disjunctive and the *Second Amended Plan* satisfies § 1129(b)(2)(C)(ii) since no interests junior to the impaired Class 4 Equity interests are receiving anything under the *Second Amended Plan*. Based on the foregoing, the Court accepts Game Creek's analysis of § 1129(b)(2)(C) and finds that the *Second Amended Plan* is fair and equitable since both prongs of § 1129(b)(2)(C) are satisfied.

Lastly, the Court will address the underlying issue that is obviously the catalyst for the resistance from Mr. Crivella in this case, which is the fact that confirmation of the *Second*

---

[12] The court in *In re Global Fertility* noted that under § 1129(b)(2)(C) "a plan need only satisfy either subsection (i) or (ii), not both of those subsections." 663 B.R. at 609.

*Amended Plan* will divest Mr. Crivella of his equity interest for far less consideration than he was hoping to receive before this involuntary Chapter 11 case was filed.[13] During the evidentiary hearing, Crivella questioned Game Creek's search for a buyer of the equity interests and insinuated that offers were left on the table. *Audio Hearing Transcript 4/23/25* at 10:34:00 – 10:36:00. Game Creek rebutted this argument by explaining, through the testimony of Mr. Lawrence, that pre-bankruptcy around 120 entities were contacted to solicit offers to purchase the Debtor, yet ultimately the Debtor was only able to secure one non-binding letter of intent from Game Creek pre-bankruptcy. *Id.* at 10:36:25 – 10:38:13 and 11:07:00 – 11:08:04. *See Movant's Exhibit 3* (Doc. 337). However, the terms were ultimately rejected by the MeSearch board, including Mr. Crivella. It appears that Game Creek has been the only party willing to put forth money to purchase this Debtor. *Id.* at 10:38:30 – 10:39:20.

To evaluate the reasonableness of the offer, the Court cannot rely on bare assertions of Crivella that the present offer is insufficient and that there may be other interested parties willing to pay more when no other party has submitted an offer. Crivella could submit a competing bid, but has elected not to, which undermines his suggestion that the Game Creek offer does not constitute fair market value. Therefore, the Court is not convinced there is a lack of good faith merely because the *Second Amended Plan* fails to pay more than a pro rata share of $100,000 to Class 4 Equity holders.

---

[13] There is reference in the record that at one point prior to the filing of this bankruptcy, Joseph Lawrence was attempting to negotiate a transaction between MeSearch and OWNLocal that would result in a $6M payment to buy out Arthur Crivella's interest in the Debtor. However, this proposal was not approved by Mr. Crivella.

## V. CONCLUSION

Based on the *Declaration* as well as the testimony of Joseph Lawrence at both the Confirmation Hearing and the Evidentiary Hearing, the Court holds that the *Second Amended Plan* was proposed in good faith in accordance with § 1129(a)(3). The *Second Amended Plan* maximizes the value to the Estate, will pay all allowed claims in full on the effective date, will allow the Debtor to reorganize and continue operations and has the full support of the Chapter 11 Trustee.[14] The Court will issue an Order Confirming Chapter 11 in accordance with this Memorandum Opinion.

Dated: May 8, 2025						BY THE COURT:

_____
John C. Melaragno, Judge
United States Bankruptcy Court


SIGNED
5/8/25 4:35 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

---

[14] Counsel for the Chapter 11 Trustee stated at the Evidentiary Hearing that the Chapter 11 Trustee supports confirmation of the *Second Amended Plan* and noted that time was of the essence in getting a plan confirmed due to the rising costs of this Debtor being in bankruptcy. Counsel for the Trustee stated that in their communications with employees, there was no indication of anything being "dissipated" from the company and based on the testimony at the Evidentiary Hearing that remained to be the Trustee's position. The Trustee was satisfied with the advertising since this the *Second Amended Plan* pays creditors in full, and after hearing the testimony and evidence at the Evidentiary Hearing, the Trustee still supports confirmation of the *Second Amended Plan* and believes it is in the best interests of this Estate and its creditors. *Audio Hearing Transcript 4/23/25* at 1:27:30 – 1:31:36.